# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES T. MERRICK,<br><br>　　　　　　　　　　Plaintiff,<br>　vs.<br><br>HILTON WORLDWIDE, INC.; HILTON HOTELS CORPORATION; CHH TORREY PINES TENANT CORP.; and DOES 1 through 10,<br><br>　　　　　　　　　　Defendants. | CASE NO. 13-CV-1568-LAB-BGS<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

　　　This is a wrongful termination case. Merrick, for many years the Director of Property Operations at the Hilton La Jolla Torrey Pines, alleges that he was let go in July 2012 because of his age and looming health problems. Defendants say his age and health had nothing to do with their decision. Business was down and it needed to cut labor costs, and letting Merrick go was the best way to do that. Now before the Court is Defendants' motion for summary judgment.

　　　Merrick asserts a total of six claims, three based on age discrimination and three based on disability discrimination. Claims one and four are for discrimination itself (age and disability, respectively), and claims two and five are for the failure to prevent it, all asserted under California's Fair Employment and Housing Act. The third and sixth claims are for wrongful termination in violation of public policy, a common law tort.

## I. Factual Background

### A. History of Merrick's Employment

Merrick began his career working for Sheraton in Chicago as a maintenance mechanic, and he worked his way up to Director of Engineering. In 1993, Sheraton transferred him to San Diego to be the Director of Engineering for the Sheraton Grande Torrey Pines hotel. Hilton acquired the hotel in 1999, and Merrick's title under Hilton's employ was changed first to Director of Hotel Operations and then Director of Property Operations.

### B. Merrick's Job Performance

In his opposition brief, Merrick goes to considerable lengths to show that he was a solid performer at the Hilton, but facts he is hoping to establish are tangential. Hilton does not argue that the termination of Merrick's position was based on, or justified on account of, his performance. Indeed, Hilton objects to the admissibility of a decade's worth of performance evaluations that Merrick presents on the ground that "Plaintiff was not terminated for performance reasons; as a result his performance evaluations are not relevant." (Doc. No. 22-1 ¶¶ 16–27.) Merrick's *position* was terminated; it's not as if *he* was terminated and replaced with someone else. In any event, Merrick claims he "was an outstanding Director of Property Operations for the hotel" and that he "was performing all his job duties as the Director of Property Operations at the hotel in a satisfactory manner at, or above, Hilton's required performance standards." (Opp'n Br. at 8–9.) The performance reviews he presents, for what they are worth, support that.

Merrick also presents so-called "SALT tables," which essentially aggregate guest satisfaction surveys to indicate how well the various hotel departments are performing. (Opp'n Br. at 9–10.) The hotel's general manager, Patrick Duffy, would review the SALT tables with the department heads, and Hilton corporate would use them to evaluate the hotel. (Merrick Decl. ¶ 15.) As Merrick puts it, "[t]he SALT scores were the customer's [sic] grades that we used to determine (and how Hilton corporate determined) the quality and level of guest service and experience being provided at the hotel." (Merrick Decl. ¶ 15.) The

way Merrick reads the SALT scores, his department was responsible for the most categories, and its scores exceeded those of all other departments. (Opp'n Br. at 10:4–13.)

### C. The Elimination of Merrick's Position

Defendants claim that in 2007 and 2008, due to the economic crisis, occupancy rates and conference bookings declined, and its revenues "decreased markedly." (Mot. at 2:17; Maehler Decl. ¶ 5.) In fact, they claim that Hilton's business still hasn't fully recovered. (Maehler Decl. ¶ 7; Duffy Dep. at 18:15–23.)[1] As a result of this decline in business, Hilton had to lay off numerous employees. (Duffy Dep. at 18:3–23.) It reduced its workforce by eight employees in mid-2008, three in 2009 (the entire pastry department), and six in 2011. It also didn't give merit increases in 2009. (Lucey Decl. ¶ 7.)[2]

In May 2012, presumably still because of the general decline of its business, Hilton corporate ordered many of its hotels to reduce their payroll expenses by 7 to 10 percent. (Duffy Dep. at 10:1–6; 10:24–11:18; 12:8–12.)[3] This directive reached the Hilton where

---

[1] Though it would seem uncontroversial that an upscale hotel experienced a loss of business in 2007–2008 and the years following, Merrick objects to Maehler's declaration on the grounds it is "[h]earsay describing what written records of the Hotel supposedly state." The Court disagrees. Maehler is the Hilton's Director of Finance, and her statements reflect her personal knowledge in that role. Likewise, Merrick objects to Michelle Lucey's declaration statement that "I am aware that the Hotel suffered decreasing revenue beginning in 2008." (Lucey Decl. ¶ 6.) Again, Lucey is the Hilton's Director of Human Resources and is speaking from personal knowledge, not about what the Hotel's written records state. The Court overrules Merrick's objections to evidence establishing the Hotel's financial distress.

[2] Merrick also objects to this testimony from Lucey, again on the ground that it is "[h]earsay describing what written records of the Hotel supposedly state." The Court overrules this objection on the same grounds. As the Director of Human Resources, Lucey can be expected to have personal knowledge of workforce reductions over the years, and the records she reviewed are simply the foundation of that personal knowledge. Besides, Merrick concedes that "Prior to the Plaintiff's lay-off, the Hotel had gone through several rounds of lay-offs, and had eliminated and/or consolidated numerous positions." (JSUF ¶ 23.) It's curious that he would concede there were rounds of layoffs before his own, but then challenge a more specific account of those layoffs by the Director of Human Resources. Indeed, Merrick's own brief explains that "Hilton provided the general manager, Duffy, with an initial set of written guidelines for a reduction in force at the hotel" and that "[t]he reduction was to be 7% to 10% of the hotel's current total payroll." (Opp'n Br. at 10.)

[3] Yet again, Merrick objects to this deposition testimony—he doesn't identify any answer in particular—on the ground that what an area vice president (Slater) *told* Duffy was being ordered is hearsay. It isn't hearsay. It's not being offered for the truth of what it asserts as much as its impact on Duffy. But more important than that, as General Manager

- 3 -

Merrick worked. (Duffy Dep. at 19:5–14.) A document titled "Management Reduction in Workforce (RIF) Timeline – May 2012" specified: "Reductions must be completed by August 3, 2012, and targeted to equal between 7%–10% of the hotels current total payroll. Reduction decisions should be heavily weighted at the senior level, where complexing and/or shared resources can augment the reduction." (PI at 208.) That document, as Merrick points out, provided that the Hilton's General Manager and Human Resources Directors—Duffy and Lucey—were to "make RIF determinations and meet with corporate functional disciplines (Engineering, F&B, HR, Rev Mgt, and Sales) to collaborate on proposed RIF position(s)." (PI at 209.) In practice, Duffy, Lucey, *and* the Director of Finance Maehler comprised the management team that made the RIF determination. (Duffy Dep. at 14:13–22; JSUF ¶ 12.)

The management team of Duffy, Lucey, and Maehler decided to eliminate a single management position and chose Merrick's position, the Director of Property Operations. (JSUF ¶¶ 11.) The team's guiding consideration was to reduce payroll as ordered, by 7 to 10 percent, with the least possible impact on the Hilton and its guests. (JSUF ¶ 14.) It also wanted to avoid having to eliminate more than one position to reach the required payroll savings. (JSUF ¶ 17.) To this end, it considered the consequences of eliminating each of the Hilton's 29 management positions, and it decided that eliminating the Director of Property Operations made the most business sense for five reasons. (JSUF ¶¶ 15–16.)

First, when his position was eliminated, Merrick was the Hilton's second highest paid employee behind Duffy, the General Manager; Merrick was making $110,325 per year, plus an annual bonus. (Maehler Decl. ¶ 6.) The Hilton couldn't operate without a general

---

of the Hilton, Duffy obviously has personal knowledge of various directives from Hilton corporate pertaining to staffing issues, and the deposition testimony here is simply an account of his foundation for that knowledge. Importantly, Merrick accepts as true the statement that "In response to this directive, the Hotel's management team decided to eliminate one management position and chose the Director of Property Operations position." (JSUF ¶ 11.) There's no point in objecting to Duffy's account that there was some directive—that a 7 to 10 percent reduction in payroll was ordered—only to concede that management acted to achieve this directive. Merrick's objections regarding the directive are overruled.

manager, and Merrick's was the only other management position where the company could meet the 7-10% directive without having to eliminate any other positions. (Duffy Dep. at 39:7–22, 64:16–25, 76:8–13; Maehler Dep. at 53:3–19.)

Second, the management team didn't want to eliminate any position that *directly* generated revenue, such as positions in banquets, restaurants, or catering. The Hilton had operated without an executive chef for many years, had recently hired one, and found that doing so directly caused an increase in sales. (JSUF ¶¶ 19–22.) The Court emphasizes "direct" effects on revenue simply because, presumably, every Hilton employee generates revenue indirectly: insofar as any position helps make the hotel a better and more desirable place to stay, the Court understands that each position generates revenue on some level. But it is not controversial for Hilton to observe that some positions may generate revenue more directly than others, and further to conclude that eliminating such a position would have a proportionally more negative impact on the hotel's overall income. In Hilton's judgment, more revenue would be directly lost by eliminating restaurant or catering jobs than Merrick's. Though Merrick's job involved keeping the Hilton presentable and running, Hilton evidently presumed that this value is already built into its guest rates, and would not degrade as quickly as other values its business provides.

Third, according to Hilton, it had already gone through several rounds of lay-offs, eliminating and consolidating numerous positions, and it did not want to further weaken "its already vulnerable departments." (Mot. at 6. *See* Duffy Dep. at 18:11–14; Maehler Dep. at 24:4–11; Lucey Dep. at 34:2–21.)

Fourth, and also in Hilton's view, the Director of Property Operations was not meant to interact with guests face-to-face, and therefore eliminating the position would "not have a direct negative impact" on the guests' experiences. (Opp'n Br. at 6; *see* Maehler Dep. at 34:8–14.)

Fifth, continuing on this theme that management had reason to view Merrick's position as less essential than others, Hilton corporate in 2009 required the Hilton to outsource (to Remington, a subsidiary of Hilton's joint owner) many of the capital projects (i.e.,

renovations) that previously had been handled and overseen by the hotel's Property Operations department, and by Merrick in particular. This meant less responsibility for someone in his position. (Duffy Dep. at 36:17–25; Lucey Dep. at 38:3–9; Maehler Dep. at 55:22–56:14.) Merrick disputes this somewhat. He acknowledges that capital projects at the Hilton were outsourced to Remington, but he insists that he assisted Remington substantially, that his duties on renovation projects remained essentially the same, and that he often made up for Remington's work because its performance was lackluster and its own project manager was rarely present. (Opp'n Br. at 8:13–24.) Duffy even admitted during his deposition that there was some validity to Merrick's grievance that Remington would be assigned to projects and would underperform. (Duffy Dep. at 50:9–12, 71:9–72:10.) A 2011 performance review confirmed that Merrick would "help the hotel by continuing to work with Remington to ensure projects are completed." (Pl 207.) What's not disputed, though, is that the official responsibility for these tasks fell to Remington.

Merrick's opposition to summary judgment invites the Court to consider whether there were three factors that the management team (Duffy, Lucey, and Maehler) failed to consider in making their decision to terminate Merrick's position.

First, Merrick maintains that the management team discussed his job performance but not the performance of other employees. (Opp'n Br. at 12:20–22.) That seems to be a misrepresentation of the record, even going by Merrick's own citations. Duffy was asked during his deposition if "any of the performance evaluations of the management employees [were] discussed" and he replied, "If I recall correctly, they were briefly discussed." (Duffy Dep. at 48:6–10.) As a follow-up, he was asked if he remembered anything else about those discussions and he replied, "Nothing other than everyone's performance was meeting standards, meeting performance guidelines."[4] (Duffy Dep. at 48:11–14.) This is confirmed

---

[4] Duffy did go on to qualify his statement to add that there was also "some discussion about Charlie [Merrick]. And it related to how he interacted with the rest of the management team." (Duffy Dep. at 48:17–19.) But that was in response to the question,"Anything else stand out about the discussion other than what you just said?" after Duffy's answer that the various managers' performance evaluations had all been discussed. (Duffy Dep. at

by Lucey's explanation that she reviewed the human resources files of the various managers whose positions were all being considered for termination. (Lucey Dep. at 23:22–24:6.) Merrick's other citations fail to support the proposition that no one else's performance was discussed. For example, he cites Duffy being asked, "Was there a discussion about any other management employee that you remember where there was some discussion of that employee having a poor performance or a negative attitude other than the discussion about Mr. Merrick?", (Duffy Dep. at 57:15–19), to which Duffy replied, "Other than what I have told you, no," (Duffy Dep. at 57:20). (*See* Opp'n Br. at 12:20–24; 18:25–19:2.) That is not the same answer as a simple "No." In fact, it explicitly references Duffy's earlier recollection that the team discussed the performance evaluations of all the managers. Likewise, Merrick suggests that Maehler testified in her deposition that only Merrick's performance was discussed, when in fact Maehler's testimony was that, because performance is not her area of expertise, she really doesn't recall whether anyone's performance was discussed, including Merrick's. (Opp'n Br. at 12:20–24 & 18:25–19:2 (citing generally PI at 329:24–330:15).) To the extent Merrick's performance was discussed by the management team prior to the termination of his position, Duffy explained in his deposition that there was some feeling that Merrick's relationship with management had deteriorated, that he had a negative attitude, and that he was displeased by the reduction in staffing and the work of Remington. (Duffy Dep. at 283:15–285:12.) There was also some discussion of the sense among the management team that Merrick was leaving work early. (Duffy Dep. at 286:10–287:15.)

Second, Merrick claims that "[t]he tenure of employees was never discussed," but that probably means very little. (Opp'n Br. at 12:23-24.) He points to Maehler's answer when questioned on that issue in her deposition, which was that tenure was not discussed but that it was data that was plainly presented on the paperwork everyone could see. (Maehler Dep.

---

48:15–19.) It was no admission that the management team talked about Merrick and nobody else, as Plaintiff's opposition characterizes it. (Opp'n Br. at 12:20–24.)

at 37:18–22.) So, simply because it wasn't discussed doesn't mean it wasn't known and wasn't taken into consideration.

Third, Merrick claims that the management team "did not discuss or examine any SALT scores for the departments to determine the customer service scores for each department." (Opp'n Br. at 11:23–25.) Though it is a fairly accurate representation of the record, it only means that SALT scores weren't explicitly discussed – not that the performance of the individual managers was not discussed. (*See, e.g.*, Lucey Dep. at 14–18; Maehler Dep. at 39:11–40:9.)

It's important to highlight that, while Merrick and Hilton are obviously at odds in this case, Merrick doesn't dispute much of the above. The Joint Statement of Undisputed Facts, which Merrick explicitly agreed to, confirms that Merrick earned a high salary, that the Hilton was directed to reduce labor costs by 7 to 10 percent, that the management team wanted to eliminate only one position, that the team considered each of the Hilton's 29 management positions, that it decided eliminating the Director of Property Operations position made the most business sense for a number of reasons, and that this was the explanation Merrick was given when his position was eliminated. (JSUF ¶¶ 3, 11, 14–23.) Merrick's opposition brief, for its part, also concedes that there was a directive to reduce payroll expenses, that Duffy, Lucey, and Maehler met to discuss it, that they decided to eliminate a position with the smallest direct impact on guests' overall experiences and least amount of direct guest interaction, and that the Director of Property Operations best met this description. (Opp'n Br. at 11:18–23, 11:26–12:4.) It concedes that Merrick's salary—projected at $113,363 with an $18,414 bonus—factored into their thinking. (Opp'n Br. at 12:5–7.) It also concedes that, in the management team's minds at least, the outsourcing of its capital projects diminished the responsibility of its Property Operations department. (Opp'n Br. at 12:13–17.)

### D.     Merrick's Disability

Hilton correctly points out that Merrick *admits* he has never been disabled and is not disabled now. (Merrick Dep. at 16:17–20.) He also admitted that to the extent he suffered any physical ailments, they weren't disabling to him professionally. He was asked in his

- 8 -

deposition, "Were you able to continue to perform your job duties with your carpal tunnel?" and he replied, "Pain is nothing to me. Of course I did." (Merrick Dep. at 28:4–6.) From Hilton's perspective, all it really knew of Merrick's condition—whatever that condition may be—was that he was seeing doctors and may need to leave work early for that reason or at some point have surgery. (Merrick Dep. at 22:2–18, 32:8–12.)

Merrick's opposition brief doesn't diverge materially from Defendants' account. He labels his carpel tunnel syndrome an "affliction" that affected his hands and wrists, but he concedes that it didn't stand in the way of him performing his job duties. (Opp'n Br. at 6:17–19.) He also references conversations with Duffy in which he casually mentioned that he was having trouble with his hands, or that he needed bloodwork done, and may have to visit a doctor or have surgery. (*Compare* Opp'n Br. at 6 *with* Duffy Dep. at 115:13–117:4.) The parties agree that Merrick is not disabled, that no one doubted his ability to perform his job, and he never needed any accommodation with the minor exception of occasionally having to leave early. (JSUF ¶¶ 8-9.)

### E. Merrick's Alleged Replacement

There is no dispute that Hilton eliminated Merrick's position of Director of Property Operations when terminating Merrick. (JSUF ¶¶ 11 & 16.) The evidence is clear that, after Merrick's termination, his subordinate Michael Kohl retained the job title of "assistant director of property operations." (PI at 336, Kohl Deposition, 9:3-4.) Nevertheless, Merrick's opposition insists that Kohl, then 45 years old, "took over all of Merrick's job duties." (Opp'n Br. at 2:16; *see also id.* at 14:3–14.) Undercutting this assertion is Merrick's own admissions that some of his job duties were absorbed by others; for instance, Merrick admits that Maehler (then 46 years old) shouldered some of the capital renovation oversight, (Opp'n Br. at 14:12-14 (citing PI 331:15-331A:19; PI 260:11)), and that Remington took over management for each capital renovation project, including responsibilities such as hiring designers and contractors, (Opp'n Br. at 8:13-17).

Merrick relies on Kohl's deposition to support his claim that Kohl replaced him, but even taken in the light most favorable to Merrick, the evidence does not precisely support

1  that fact. (Opp'n Br. at 14:3-14.) Kohl answered "No" to the question, "Can you describe
2  any functions that Mr. Merrick, to your knowledge, performed before July 2012 that you have
3  not taken over and performed yourself?" Defendants are correct to point out that this answer
4  extends no further than Kohl's knowledge of Merrick's duties. In any event, it does not
5  create a material conflict with the record, including Plaintiff's own evidence, that other
6  personnel (e.g., Maeler) and entities (e.g., Remington) took over some of Merrick's other
7  duties. Viewing the evidence in the light most favorable to Merrick, the record is clear that
8  after Hilton eliminated Merrick's position, Kohl took over some, but not all, of Merrick's
9  previous responsibilities while retaining his prior job title and description.

**II. Discussion**

    A.    Legal Standard

Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the moving party's burden to show there is no factual issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, the burden shifts to the non-moving party to show there is a genuine issue for trial. *Id*. at 331. The Court may grant summary judgment as to some material facts. Fed. R. Civ. P. 56(g).

The Court considers the record as a whole and draws all reasonable inferences in the light most favorable to the non-moving party. *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). The Court does not make credibility determinations or weigh conflicting evidence. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986). Rather, the Court determines whether the record "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

"[W]hen entertaining motions for summary judgment in employment discrimination cases arising under state law, federal courts sitting in diversity must apply the [U.S. Supreme Court's] *McDonnell Douglas* burden-shifting scheme as a federal procedural rule." *Snead v. Metropolitan Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1094 (9th Cir. 2001). Under the

*McDonnell Douglas* framework:

> [T]he employee must first establish a prima facie case of age discrimination. If the employee has justified a presumption of discrimination, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. If the employer satisfies its burden, the employee must then prove that the reason advanced by the employer constitutes mere pretext for unlawful discrimination.

*Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  Because state and federal employment discrimination laws are similar, California courts look to federal precedent when interpreting FEHA.  *Guz v. Bechtel National, Inc.*, 8 P.3d 1089, 1113 (Cal. 2000).  Generally, to establish a prima facie case under FEHA, a plaintiff must provide evidence that: "(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination . . . , and (4) some other circumstance suggests discriminatory motive." *Id.*  If a plaintiff makes out a prima facie case and a defendant can articulate a legitimate, nondiscriminatory reason for its employment action, a plaintiff may demonstrate pretext in either of two ways: (1) directly, by showing that unlawful discrimination more likely than not motivated the employer; or (2) indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable. *Chuang v. Univ. of Cal. Davis, Bd. of Trustees*, 225 F.3d 1115, 1127 (9th Cir. 2000).

**B.    Analysis**

    1.    Age Discrimination Claims

Merrick's first and second FEHA causes of action are for age discrimination based on wrongful termination under Cal. Gov't Code § 12940(a) and for failure to prevent age discrimination under Cal. Gov't Code § 12940(k). (Compl. ¶¶ 21-23; 24-25.)  His third cause of action is for age discrimination in violation of public policy.  (*Id.* ¶¶ 26-28.)  Defendants move for summary judgment on the grounds that Merrick cannot show the fourth element of a prima facie case, i.e., any indicia of a discriminatory motive.  Defendants further argue

that, even if Merrick has stated a prima facie case, he cannot show that their legitimate, nondiscriminatory reasons for terminating Merrick – the business directive to reduce payroll by 7–10%, the management team's desire to accomplish this by eliminating only one position, the reasoning behind choosing a position that did not generate revenue directly or have face-to-face contact with hotel guests – were pretextual. Finally, Defendants argue that if Merrick's substantive discrimination claim fails, his other claims must fail as well.

          a.      Age Discrimination under Cal. Gov't Code § 12940(a)

FEHA makes it unlawful for an employer to discharge an employee because of his age. Cal. Gov't Code § 12940(a). The first element of a prima facie case can usually be established by showing that Plaintiff is over the age of 40, and the parties agree that Merrick is. (JSUF ¶ 1.) There is also no dispute as to the next two elements: that he was qualified and that he lost his job for reasons unrelated to his qualifications. (JSUF ¶ 16; *see also* Mot. at 9:11-10:23.) But not every qualified individual over 40 who loses his job can make a prima facie discrimination case; there must also be indicia of a discriminatory motive. California courts recognize that a reliable (but not essential) way to indicate a discriminatory motive is by showing "that persons significantly younger, but otherwise similarly situated, were treated more favorably." *Guz*, 8 P.3d at 1121. California courts have also allowed plaintiffs to establish discriminatory intent in their prima facie cases by showing that "the employee was replaced in his position by a significantly younger person." *Hersant v. Dep't of Social Services*, 57 Cal. App. 4th 997, 1003 (1997). This is the avenue Merrick takes, relying on the disparate treatment he received compared to his younger assistant, Kohl. (Opp'n Br. at 14:3-14; 15:20-25 (citing *Hersant*, 57 Cal. App. 4th at 1005-06).)

On this record, the Court cannot conclude that Merrick has established a prima facie case that Defendants acted with a discriminatory motive. Merrick's evidence establishes that Hilton eliminated his Director of Property Operations position, and that as a result, Assistant Director of Property Operations Kohl took over some, but not all, of Merrick's previous responsibilities. As noted above, Kohl kept his "assistant" title and position, while some of Merrick's responsibilities were outsourced to Remington. But Merrick does not show "that

persons significantly younger, but otherwise similarly situated, were treated more favorably." *Guz*, 8 P.3d at 1121. Merrick was not similarly situated with Kohl or Maehler; one was his subordinate, the other managed a different department, and neither's salary would have been enough to have satisfied Hilton corporate's 7-10% payroll reduction mandate by themselves. (JSUF ¶¶ 14 & 17.) Merrick's argument is further undermined by the fact that the *Guz* test is not meant to be applied to purported instances of discrimination among a small sample size of employees: in *Guz*, the California Supreme Court held that "a group of six is simply too small to be statistically significant." *Guz*, 8 P.3d at 1127. Neither has Merrick shown that he was "replaced in his position by a significantly younger person." *Hersant*, 57 Cal. App. 4th at 1003. Kohl and Maehler did not fully replace Merrick, and neither was handed Merrick's position as Director of Property Operations.

But the biggest problem in Merrick's prima facie case is the evidence supporting Hilton's *non*discriminatory intent. It is undisputed that Hilton could have also accomplished the mandated 7-10% reduction in payroll if it eliminated Duffy's position (General Manager) instead of Merrick's. (JSUF ¶¶ 17-18, *accord* Maehler Decl. ¶ 6). It is also clear from the record that Duffy was *older* than Merrick. (Opp'n Br. at 6 (citing Pl 259-62).) Finally, it is undisputed that Hilton chose to eliminate the position of the slightly *younger* employee, Merrick, for business reasons – namely the belief that Merrick's position was less essential, generated revenue indirectly, and had less face-to-face contact with hotel guests. (JSUF ¶¶ 11, 14, 16, & 18.) In the small sample size of Duffy, Merrick, Maehler, and Kohl, Hilton's decision not to eliminate the oldest employee's position but rather the second-oldest employee's, as well as its decision to redistribute Merrick's duties rather than replace him, does not bear indicia of discriminatory intent.

While the Court concludes that Merrick has not made a prima facie case, his age discrimination claim has another fatal flaw: the record firmly establishes Defendants' legitimate, nondiscriminatory reasons for eliminating his position. Merrick concedes through the Joint Statement of Undisputed Facts that he earned a high salary, that the Hilton was directed to reduce labor costs by 7–10%, that the management team wanted to eliminate

only one position while minimizing impact on revenues and guest experiences, that the team considered each of the Hilton's 29 management positions, that it decided eliminating the Director of Property Operations position made the most business sense in light of these criteria, and that this was the explanation Merrick was given when his position was eliminated. (JSUF ¶¶ 3, 11, 14–23.) As noted above, Merrick's opposition brief reiterates all of these concessions. (Opp'n Br. at 11:18–23, 11:26–12:7.) By offering these explanations, Defendants have articulated legitimate, nondiscriminatory reasons for their actions. *McDonnell Douglas* requires Merrick to raise a genuine factual question whether, viewing the evidence in the light most favorable to Merrick, Hilton's reasons could be pretextual. Because Merrick concedes the genuineness of Hilton's reasons, he cannot prove that they were mere pretext as required by the *McDonnell Douglas* framework. A reasonable fact-finder could not disbelieve a defendant's legitimate, nondiscriminatory reasons for its actions when the plaintiff does not even dispute them. *See Diaz*, 521 F.3d at 1207 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

As a result, Merrick's age discrimination claim under FEHA must be denied as a matter of law.

        b.    Failure to Prevent Age Discrimination under Cal. Gov't Code § 12940(k)

Merrick's second cause of action must fail for the same reasons as his underlying age discrimination claim. Under California law, a plaintiff cannot succeed on a cause of action for failure to prevent discrimination where no discrimination occurred. *Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 288 (1998) ("[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen, for not having a policy to prevent discrimination when no discrimination occurred.") (alteration in original). Defendants move for summary judgment on this ground, (Mot. at 16), and Merrick's opposition does not disagree, instead doubling down on Merrick's position that he has raised triable issues of fact, (Opp'n Br. at 21-22). Applying *Trujillo,* the Court concludes that because no age discrimination occurred,

Defendants are entitled to summary judgment on Merrick's claim for failure to prevent age discrimination.

### c. Age Discrimination in Violation of Public Policy

To sustain a claim of wrongful discharge in violation of fundamental public policy, a plaintiff "must prove that his dismissal violated a policy that is (1) fundamental, (2) beneficial for the public, and (3) embodied in a statute or constitutional provision." *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1256 (1994) (footnotes omitted). In this case, Merrick accuses Defendants of violating public policy by discriminating against employees on the basis of age. (Compl. ¶¶ 27-28.) The statute or constitutional provision on which Merrick predicates this public policy is FEHA. (Compl. ¶ 27 (citing Cal. Gov't Code § 12920).) The specific policy for which FEHA stands is the "protection and safeguarding of the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of . . . enumerated characteristics" including age, as well as "to provide, under the police power of the state, effective remedies which will eliminate such discriminatory practices." *Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 286.

Logically, if no age discrimination occurred within the meaning of FEHA, the public policy to provide a right of action and remedy would not be implicated. As the California Supreme Court held, "[i]t would be absurd to forbid a plaintiff to sue a supervisor under the FEHA, then allow essentially the same action under a different rubric," i.e., a cause of action for discharge in violation of public policy. *Reno v. Baird*, 18 Cal.4th 640, 664 (1998) (holding that "[b]ecause plaintiff may not sue [defendant] as an individual supervisor under the FEHA, she may not sue her individually for wrongful discharge in violation of public policy"). Because Merrick's statutory claim for age discrimination under FEHA fails, so too must his common law claim for age discrimination in violation of the public policy set out in FEHA.

Accordingly, the Court grants Defendants' motion for summary judgment on Merrick's third claim.

///

### 2. Disability Discrimination Claims

Merrick's fourth cause of action is a FEHA claim for disability discrimination under Cal. Gov't Code §§ 12940(a), (m), and (n), and his fifth is a FEHA claim for failure to prevent it under Cal. Gov't Code § 12940(k). (Compl. ¶¶ 29-32; 33-34.) His sixth cause of action is for disability discrimination in violation of public policy. (Id. ¶¶ 35-37.) Defendants move for summary judgment on grounds that Plaintiff cannot state a prima facie case on any of these claims as a matter of law because he was not disabled, admits he was never disabled, and was never perceived by Defendants to be disabled. (Mot. at 10-12.) Because Defendants assert the same reason for all three causes of action, the Court will address them together.

A plaintiff may make out a disability discrimination claim under FEHA "only if the adverse employment action occurs *because of a disability* and the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation." *Green v. State of California*, 165 P.3d 118, 123 (2007) (emphasis added). Thus, the first "essential element" of the prima facie case is proof that "the plaintiff has a disability covered by FEHA." *Furtado v. State Personnel Bd.*, 212 Cal. App. 4th 729, 745 (2013). Under FEHA, "the touchstone of a qualifying handicap or disability is an actual or perceived physiological disorder which affects a major body system and limits the individual's ability to participate in one or more major life activities." *Cassista v. Cmty. Foods, Inc.*, 5 Cal. 4th 1050, 1061 (1993).

The fundamental problem with all three of Merrick's disability claims is that Merrick was never disabled. Merrick's opposition to summary judgment offers that the major life activity his carpal tunnel syndrome substantially limits was "working," a statement belied by Merrick's own testimony and his agreement to the Joint Statement of Undisputed Facts. (*See* Opp'n Br. at 15.) According to Plaintiff himself, "Plaintiff admits that he does not have a disability that affected his ability to perform his job." (JSUF ¶ 9.) In fact, the parties agree that no one doubted his ability to perform his job, and he never needed any accommodation with the minor exception of occasionally having to leave early. (JSUF ¶¶ 8, 10.) Defendants correctly point out that Merrick testified that he has never been disabled and is not disabled

now. (Merrick Dep. at 16:17–20.) He also admitted that to the extent he suffered any physical ailments such as carpel tunnel syndrome, they did not interfere with his ability to work: he was asked in his deposition, "Were you able to continue to perform your job duties with your carpal tunnel?" and he replied, "Pain is nothing to me. Of course I did." (Merrick Dep. at 28:4–6.) Though the Court takes all evidence in the light most favorable to Merrick, it is not obliged to do the same with Merrick's unsupported argumentation. *See Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1098 (9th Cir. 2013) ("[A]ttorney argument . . in the absence of evidence, does not create a triable dispute of material fact . . . ."). Because no reasonable fact-finder could find that Merrick was disabled or even perceived as disabled at the time his position was eliminated, the Court **grants** Defendants' motion for summary judgment as to Merrick's disability discrimination claims.

Further undermining Merrick's disability discrimination claims are Defendants' undisputed and legitimate, nondiscriminatory reasons for eliminating his position. As noted above, Merrick concedes that he earned a high salary, that the Hilton was directed to reduce labor costs by 7–10%, that the management team wanted to eliminate only one position while minimizing impact on revenues and guest experiences, that the team considered each of the Hilton's 29 management positions, that it decided eliminating the Director of Property Operations position made the most business sense in light of these criteria, and that this was the explanation Merrick was given when his position was eliminated. (JSUF ¶¶ 3, 11, 14–23.) These admitted facts explain that Hilton could not have fired Merrick "because of" a disability, actual or perceived. *See Green*, 165 P.3d at 123.

Under the *McDonnell Douglas* framework, Merrick concedes the genuineness of Hilton's reasons, and he cannot prove that they were mere pretext. A reasonable fact-finder could not disbelieve a defendant's legitimate, nondiscriminatory reasons for its actions when the plaintiff does not even dispute them. *See Diaz*, 521 F.3d at 1207 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). This is another reason why the Court must **grant** Defendants' motion for summary judgment as to Merrick's disability discrimination claims.

Because no disability discrimination occurred, Defendants could not have failed to prevent it. *See Trujillo v. North County Transit Dist.*, 63 Cal. App. 4th 280, 288 (1998). The Court therefore **grants** summary judgment against Merrick's fifth cause of action, for failure to prevent disability discrimination.

Finally, Merrick's disability discrimination claim in violation of the public policy established by FEHA must fail where his FEHA claim itself fails. *See Reno v. Baird*, 18 Cal.4th 640, 664 (1998). Accordingly, the Court **grants** summary judgment against Merrick's sixth and final cause of action.

**III. Conclusion**

Even examining all evidence and drawing all factual inferences in the light most favorable to Merrick, the undisputed record shows that Defendants did not eliminate Merrick's position on the basis of his age or because of a disability he did not have; rather, Merrick concedes that Defendants had legitimate, nondiscriminatory reasons for their actions. The Court therefore **grants** Defendants' motion for summary judgment as to all six of Merrick's causes of action.

**IT IS SO ORDERED**.

DATED: November 5, 2014

*Larry A. Burns*

**HONORABLE LARRY ALAN BURNS**
United States District Judge